439 Mass. 857 (2003)                                         857

Franklin W. Olin College of Engineering *v*. Department of Telecommunications & Energy.

FRANKLIN W. OLIN COLLEGE OF ENGINEERING & another[1] *vs.*
DEPARTMENT OF TELECOMMUNICATIONS & ENERGY
& another.[2]

Suffolk. May 8, 2003. - August 6, 2003.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Electric Company. Electricity. Municipal Corporations,* Municipal electric
plant. *Public Utilities,* Electric company. *Department of Telecommunications and Energy.*

Discussion of the historical congruence of exclusive service territories for
electric utilities and municipal boundaries in the context of the electric util-
ity restructuring act, St. 1997, c. 164. [860]
The Department of Telecommunications and Energy properly interpreted the
term "service territory" as it appears in the electric utility restructuring act,
St. 1997, c. 164, when it required that the plaintiff, located entirely in one
town, receive electricity service from the provider that exclusively served
that geographic area, rather than from another provider that had provided
service to the property in question prior to its sale to the plaintiff, where
G. L. c. 164, § 1, expressed a clear legislative policy favoring municipally
defined service territories, and where such service presented no significant
disruption or other extraordinary circumstances. [860-863]
This court concluded that the Department of Telecommunications and Energy
retained discretion to recognize individual exceptions to the municipal
boundary rule for the provision of electricity under G. L. c. 164, § 1B, and
did not abuse its discretion in declining to allow the plaintiff to get a better
deal on its electric rate from an electricity service provider in a neighbor-
ing municipality. [863-864]

CIVIL ACTION commenced in the Supreme Judicial Court for
the county of Suffolk on November 13, 2002.

The case was reserved and reported by *Cordy,* J.

*Eric J. Krathwohl (Scott A. Stokes* with him) for Franklin W.
Olin College of Engineering.

*Alan K. Posner (Kenneth M. Barna* with him) for Wellesley
Municipal Light Plant.

[1]Wellesley Municipal Light Plant (Wellesley Municipal) was allowed to
intervene as a plaintiff.

[2]Boston Edison Company, doing business as NStar Electric (Edison), was
allowed to intervene as a defendant.

*John E. Bowman, Jr.,* Assistant Attorney General, for Department of Telecommunications and Energy.

*Robert J. Keegan (David S. Rosenzweig* with him) for Boston Edison Company.

CORDY, J. In 1997, the electric utility restructuring act, St. 1997, c. 164 (Restructuring Act), introduced competition into the generation of electricity, but preserved monopolies for its distribution. See generally *Shea* v. *Boston Edison Co.,* 431 Mass. 251 (2000). This case requires us to determine whether the Department of Telecommunications and Energy (department) properly interpreted and applied a provision of the Restructuring Act, relative to the latter feature, directing it to define the exclusive "service territories" for each electric distribution company. The context is an appeal by Franklin W. Olin College of Engineering (Olin) from an order of the department requiring it to receive electricity service from Boston Edison Company, doing business as NStar Electric (Edison), rather than from Wellesley Municipal Light Plant (Wellesley Municipal). We affirm the order of the department.

1. *Background.* Edison is an investor-owned utility that since 1903 has provided electricity to the residents of the town of Needham, which adjoins the town of Wellesley. Wellesley Municipal is a municipal lighting plant that since 1892 has provided electricity to the residents of Wellesley and a small number of other customers outside the town. See G. L. c. 164, § 34; St. 1891, c. 370. Babson College (Babson) is an educational institution whose campus straddles the boundary between Wellesley and Needham, but is located primarily in Wellesley. Babson receives most of its electric service from Wellesley Municipal at a "switchgear"— an electricity transfer point — located on the Wellesley side of the Babson campus. The electricity is then distributed on Babson-owned lines to its facilities in Wellesley and to some of its facilities on the Needham side of the campus.

In March, 2000, Olin purchased seventy acres of land from Babson, on which it intended to establish its campus. This parcel, which is divided into six lots, is located entirely within Needham. At the time of the acquisition by Olin, the facilities located on five of the lots received electric service from Edison.

(These lots are not at issue in this litigation.) Prior to its purchase by Olin, the sixth lot had been a parking lot (lot 2), illuminated by street lamps that Babson connected to its own internal electricity network emanating from the Wellesley switch gear. The lamps were removed before the lot was sold to Olin. The question presented in this litigation is whether Edison or Wellesley Municipal should provide electric service to the buildings currently being constructed on lot 2.

On November 9, 2001, Olin filed a petition with the department requesting that it order Wellesley Municipal to provide electric service to lot 2. Although not conceding that it was located in Edison's service territory, Olin did acknowledge that its location in Needham might make the issue of its proper service provider a contested one, and so requested that the department foreclose any legal dispute by either (a) ruling pursuant to 220 Code Mass. Regs. § 2.08 (1993)[3] that lot 2 should receive electricity from Wellesley Municipal; or (b) ordering Wellesley Municipal, pursuant to G. L. c. 164, §§ 47 and 47A (d),[4] to provide power to lot 2. As reasons for its request, Olin listed reduced cost, greater reliability of service, reduced disruption of public ways and property, and its prospective partnership with Babson in certain endeavors. The department permitted Edison and Wellesley Municipal to intervene in the proceedings. Edison claimed that because Olin was located entirely within Needham, Olin must be served by Edison.

After hearings on the matter, the department issued an order on October 24, 2002, finding that Needham is within Edison's exclusive service territory; Olin's campus, including lot 2, is within Needham; and all of Olin's electricity consumption occurs in Needham. Consequently, it concluded that Olin was within Edison's "service territory" as provided in G. L. c. 164, § 1B (a), and Edison was to be Olin's distribution company. The department also declined to exercise what it viewed as its

---

[3]Title 220 Code Mass. Regs. § 2.08 (1993) allows the department to issue an advisory ruling applying a statute to a petitioning party.

[4]General Laws c. 164, § 47, gives the department power in circumstances not present here to authorize a municipal light plant to provide service to customers in an adjoining municipality. General Laws c. 164, § 47A (d), gives a municipal light plant the authority to provide service to an adjoining municipality if the department so orders pursuant to § 47.

limited discretion to depart from the legislative policy of defining service territories along municipal boundaries where that is possible without giving rise to anomalies.

Olin appealed the department's order pursuant to G. L. c. 25, § 5, and a single justice of this court stayed the order and reserved and reported the case to the full court.

2. *Discussion.* Historically, municipalities have been served by a single electric utility, such as Edison in Needham and Wellesley Municipal in Wellesley. This practice was almost completely uniform throughout the Commonwealth, with only eleven of 351 cities and towns generally served by more than one provider.[5]

Consistent with the historical congruence of service territories and municipal boundaries, the Restructuring Act directed the department to "define" service territories for each distribution company "following to the extent possible municipal boundaries." G. L. c. 164, § 1B (*a*).[6] A "[s]ervice territory" is further defined as "the geographic area in which a distribution company provided distribution service on July 1, 1997." G. L. c. 164, §§ 1, 1B (*a*). Once defined by the department, these service territories are to be exclusive, and each distribution company assumes an obligation to provide service to all customers within its assigned territories. G. L. c. 164, § 1B (*a*).

Before the department, Olin and Wellesley Municipal argued, as they do on appeal, that lot 2 is a "geographic area" within the meaning of G. L. c. 164, § 1, and that on July 1, 1997, it was actually receiving electricity from Wellesley Municipal through Babson's internal system. Therefore, it was and should remain part of Wellesley Municipal's "service territory" as provided in G. L. c. 164, § 1B (*a*). The department disagreed.

---

[5]According to the department, of the 351 cities and towns in the Commonwealth, only Bellingham, Cheshire, Dighton, Erving, Hancock, Lakeville, Lenox, Pembroke, Russell, Scituate, and Westport are generally served by more than one provider.

[6]A "distribution company" is that arm of a utility responsible for transmitting electricity from a generation facility or power grid to the end consumer. See *Shea* v. *Boston Edison Co.*, 431 Mass. 251, 253-255 (2000). For purposes of this case we use the term interchangeably with "service provider" or "electricity provider."

Quoting its Report to the General Court Pursuant to Section 312 of the Electric Restructuring Act at 37 (2000), it held that a service territory "encompass[es] the *municipality* in which a distribution company is operating, versus the *physical area* reached by the lines of that utility" (emphasis added). Because Edison actually served Needham on July 1, 1997, customers located within Needham were in Edison's exclusive service territory, with exceptions only for customers whose property straddled municipal boundaries,[7] such as Babson, and for other anomalies.[8] Because lot 2 was no longer owned by a straddling customer, and the "structures that received service from [Wellesley Municipal] through Babson on July 1, 1997," were removed, it became possible "to conform the service territory boundary to the municipal boundary in this case without an anomalous result." Hence, the department concluded that lot 2 was within Edison's exclusive service territory.

We afford substantial deference to an agency's interpretation of a statute that it is charged with administering. *City Council of Agawam* v. *Energy Facilities Siting Bd.*, 437 Mass. 821, 828 (2002). While G. L. c. 164, § 1, does not further define the term "geographic area" as it is used in the definition of a "service territory" (a "geographic area in which a distribution company" operates), it does express a clear legislative policy favoring municipally defined service territories. The department's interpretation of the term "service territory" to encompass the entire municipality in which a distribution company operates, and not just the physical area reached by the lines then existent in that municipality, is consistent with that policy. *City Council of Agawam* v. *Energy Facilities Siting Bd.*,

---

[7]With respect to customers whose property straddled municipal boundaries, it was the department's practice that they could select their utility provider. See *Massachusetts Elec. Co.*, D.T.E. 98-122, at 8 (2002).

[8]The Cartwright Road area of Needham, discussed at some length before the department and in the parties' briefs, is a good example of a geographic anomaly. Prior to the Restructuring Act, the department had initiated an investigation (D.P.U. 86-45, 86-144 [1987]), and concluded that this area ought to be served by Wellesley Municipal rather than Edison because it was physically separated from the rest of Needham by wetlands. D.P.U. 86-45, 86-144 (1987).

*supra.*[9] We see no reason to set it aside.[10] Nor do we see any reason to upset its conclusion that once an anomaly (such as a straddling customer) is eliminated, the affected property ought to be served by the distribution company within whose service

[9]Wellesley Municipal makes much of the fact that the department's position in this litigation — that a "service territory" equates with a municipal boundary — is apparently contrary to a remark it made in D.P.U. 86-45, 86-144 at 8 (1987), its 1987 decision regarding Cartwright Road, in which it stated that, because Wellesley Municipal had historically served the Cartwright Road area, that area was "within [Wellesley Municipal's] authorized service territory." Wellesley Municipal contends that because the department's current interpretation of "service territory" conflicts with that term's previous definition, the department's current ruling should be reversed. There are three problems with this argument. The first is the Restructuring Act, which was enacted ten years after the Cartwright Road decision. The second is that the department's use of the term "service territory" in its 1987 opinion was not precise; it referred to the Cartwright Road area as also being within Edison's "service territory" because the area was located in Needham. The dual use of the phrase is consistent with its current interpretation. Further, the Cartwright Road area comprised an entire neighborhood, not the single lot at issue here, and the decision did not unequivocally establish that the definition of "service territory" could include one lot. Third, even if the department's interpretation in this case is inconsistent with its previous ruling, such a contradiction does not render the more recent interpretation invalid. While "[s]ignificance in interpretation may be given to a *consistent,* long continued administrative application of an ambiguous statute" (emphasis in original), *Connery v. Commissioner of Correction,* 414 Mass. 1009, 1010 (1993), quoting *Cleary v. Cardullo's, Inc.,* 347 Mass. 337, 343 (1964), the meaning the department apparently gives to a phrase in a single case is not established automatically as its meaning in all future cases.

[10]As a practical matter, the use of municipal boundaries also reduces the uncertainty surrounding lots that are not currently receiving electric service. If service territories were defined on a lot-by-lot basis, an unused lot would not have been "actually served" by any distribution company on July 1, 1997, and thus would not be part of any service territory until the department assigned it to one. Olin's argument that a municipally based rule will increase confusion because every time a straddling lot is subdivided into smaller lots that do not cross municipal borders some lots may be ordered to receive power from a new distribution company, is overstated. First, the phenomenon of straddling customers balkanizing into sublots should not be so prevalent that mass confusion regarding electric service ensues. Second, while the demise of a straddling customer may cause some lots to change providers, the identity of those providers will be known beforehand, so that while change may occur, confusion need not accompany it. Finally, the department, as always, retains the discretion to assign a customer to a provider different from the one serving its service territory should the cost of switching service or the resulting network be prohibitively expensive, unsafe, or otherwise unwise. See *infra.*

territory it resides in the absence of significant disruption or other extraordinary circumstances. The facts here present no such circumstances. The only facilities previously served by Wellesley Municipal were street lamps, and they were removed before Olin bought the land.

Olin next claims that, even if G. L. c. 164, § 1B (*a*), places it in Edison's service territory, the department retains the discretion to reassign it based on policy considerations, and that in this case the department abused its discretion by refusing to make findings or consider Olin's policy arguments — such as cost and service reliability — for remaining in Wellesley Municipal's service territory.

In proceedings undertaken soon after the enactment of the Restructuring Act, the department had ruled that it could deviate from municipal boundaries in assigning customers to electric utilities "if facts and fairness so warrant." Massachusetts Elec. Co., D.T.E. 98-122, at 7 (2002). In its October 24 order, the department noted that, while "prior precedent may remain instructive," G. L. c. 164, § 1B (*a*), substantially narrowed the department's authority to consider such factors because of the mandate, now statutory, to conform service territories to municipal boundaries wherever possible. As a consequence, it gave only cursory attention to Olin's "facts and fairness" policy arguments, finding that none of them warranted a "Department-authorized departure from [Edison's] defined service territory."

The fact that service territories are to be defined with reference to municipal boundaries does not mean that the Restructuring Act forecloses any deviation from those boundaries. Indeed, the fact that § 1B (*a*) directs that municipal boundaries be followed only "to the extent possible" stands, at least in part, as legislative recognition that uniquely situated customers or areas may require individualized accommodation. We see no legislative intention, for example, to overrule the department's practice of permitting a straddling customer more flexibility in selecting the provider from which it is to receive electric service, or that an area such as Cartwright Road, see note 8, *supra*, must be served by the provider for the service territory in which it is located regardless of the harm to the environment or the extraordinary expense that would be incurred. Consequently, we

conclude that the department retains discretion to recognize individual exceptions to the municipal boundary rule under G. L. c. 164, § 1B. While we need not define the precise contours of that discretion in this case, the department's conclusion that such discretion does not extend to customers such as Olin, who seek principally to get a better deal on their electric rate from a provider across the border, is a reasonable one. The pressure on the department from customers anxious to get relief on that basis would threaten to recreate the very "patchwork quilt" of electric service providers that G. L. c. 164, § 1B, was intended to prevent.

While the department must give some consideration to an applicant's reasons for its service request, a finding that the reasons are not of the type or the gravity that would warrant the exercise of such discretion was an adequate response in this case. The department's rejection of Olin's request on that basis did not constitute an abuse of discretion.

The order of the department is affirmed.

*So ordered.*