Boston Edison Company[1] & another[2] *vs.* Town of Bedford.

Suffolk. May 2, 2005. - July 28, 2005.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Municipal Corporations,* By-laws and ordinances.

This court affirmed a judgment of the Superior Court declaring invalid a town's bylaw that imposed fines on the owner of an existing utility pole for failure to remove the pole within the time provided by G. L. c. 164, § 34B, following the installation of a replacement pole, because although the statute contained no express legislative intent to forbid local activity regarding double pole removal, the comprehensive nature of G. L. c. 164 implied that the Legislature intended to preempt municipalities from adopting bylaws on the subject, and because the bylaw had the practical effect of frustrating the fundamental State policy of ensuring uniform and efficient utility services to the public. [780-785]

Civil action commenced in the Superior Court Department on February 10, 2004.

The case was heard by *John C. Cratsley,* J, on motions for summary judgment.

The Supreme Judicial Court granted an application for direct appellate review.

*Michael F.X. Dolan, Jr.,* for the defendant.

*Francis M. Lynch (Barbara Anne Sousa & David S. Rosenzweig* with him) for the plaintiffs.

The following submitted briefs for amici curiae:

*David C. Lodemore* for Massachusetts Electric Company & another.

*Thomas R. Teehan & Christopher S. Aronson* for KeySpan Energy Delivery New England.

Marshall, C.J. We consider in this case whether a town may adopt a bylaw that imposes fines on the owner of an existing

---

[1]Doing business as NSTAR Electric.

[2]Verizon New England, Inc., doing business as Verizon Massachusetts.

utility pole for failing to remove the pole within the time provided by G. L. c. 164, § 34B, following installation of a replacement pole. A judge in the Superior Court concluded that the bylaw is preempted by G. L. c. 164, § 34B, and granted summary judgment in favor of the pole owners. He declared the bylaw invalid because its adoption exceeded the town's legislative authority pursuant to § 6 of art. 89 of the Amendments to the Massachusetts Constitution (home rule amendment).[3] The town appealed, and we granted the parties' joint application for direct appellate review. Because the bylaw "has the practical effect of frustrating the fundamental State policy of ensuring uniform and efficient utility services to the public," *Boston Gas Co.* v. *Somerville*, 420 Mass. 702, 706 (1995), we affirm.[4]

1. *Background.* Before turning to the procedural history and merits of the case, we first discuss the genesis of "double pole sets" and the approaches taken by the Legislature, the Department of Telecommunications and Energy (department), the plaintiffs, and the town of Bedford (town) to minimize their occurrence.[5]

Approximately ninety per cent of the utility poles in Massachusetts are owned jointly by electric and telephone companies, such as the plaintiffs. Other enterprises, however, have statutory rights to use the poles,[6] a situation that complicates matters when an owner needs to replace an existing

---

[3]Article 89, § 6, of the Amendments to the Massachusetts Constitution (home rule amendment) provides, in pertinent part: "Any city or town may, by the adoption, amendment, or repeal of local ordinances or by-laws, exercise any power or function which the general court has power to confer upon it, *which is not inconsistent with* the constitution or *laws enacted by the general court . . .*" (emphasis added).

[4]We acknowledge the amicus brief of KeySpan Energy Delivery New England and the amicus brief filed jointly by Massachusetts Electric Company and Nantucket Electric Company.

[5]As of October 14, 2003, there were 25,686 double pole sets in Massachusetts, representing about two per cent of the approximately 1,228,684 utility poles then existing in the Commonwealth.

[6]To promote competition in the telecommunications services market, Federal and State laws mandate that pole owners provide cable and telecommunications carriers with nondiscriminatory access to utility poles for the placement of their facilities. See, e.g., 47 U.S.C. § 224 (2000); G. L. c. 166, § 25A; 220 Code Mass. Regs. §§ 45.00 (2000). Municipalities may also attach facilities

pole.[7] When a pole needs replacement, the owner places a new pole adjacent to it so that owners of the attached facilities (users) may transfer their attachments from the existing pole to the new pole. Users complete the transfers sequentially, relying on their specialized expertise and training to prevent interruption of services. The transfer of pole facilities must take place in a predetermined sequence to ensure the safety of workers performing the transfers and to avoid the disruption of services.[8] Only after all the attachments are transferred to the new pole can the owner remove the old pole. The presence of double pole sets for prolonged periods while attachments are transferred from the old to the new pole present aesthetic and safety concerns. See, e.g., note 17, *infra.* The Legislature enacted G. L. c. 164, § 34B, placing a ninety-day limit on the utility pole replacement process just described, but made no express provision for its enforcement.[9]

On January 9, 2002, more than four years after the enactment of G. L. c. 164, § 34B, the department began an investigation into the status of double poles, acting pursuant to G. L. c. 164, § 76.[10] The department directed pole owners to provide an inventory of double pole sets in each municipality

to the poles to transmit emergency communications such as fire alarm signals. See G. L. c. 166, § 24.

[7]A utility pole needs replacement when it is no longer structurally sound because of age or damage, lacks sufficient space for new attachments, or cannot accommodate an electric distribution system upgrade. Construction projects or road work may also necessitate pole replacement.

[8]Transfers typically start from the facilities located at the top of the existing pole and proceed downward. Accordingly, electrical facilities, which generally are located at the top of the pole, are moved first. Fire alarm wires, cable television wires, communications wires, and telephone wires are then moved in sequential order.

[9]General Laws c. 164, § 34B, inserted by St. 1997, c. 164, § 196, provides in pertinent part: "A distribution company or a telephone company engaging in the removal of an existing pole and the installation of a new pole in place thereof shall complete the transfer of wires, all repairs, and the removal of the existing pole from the site within 90 days from the date of the installation of the new pole . . . ."

[10]General Laws c. 164, § 76, provides in pertinent part: "The department shall have the general supervision of all gas and electric companies and shall make all necessary examination and inquiries and keep itself informed as to the condition of the respective properties owned by such corporations and the manner in which they are conducted with reference to the safety and

and a report describing their practices for notifying users of pending facility transfers and ensuring the removal of old poles pursuant to § 34B. Following a meeting with the department, the utility companies collectively worked to implement the pole lifecycle management (PLM) system, a Statewide system for coordinated double pole management.[11]

On July 31, 2003, the Legislature directed the department to study the issue of the number of double poles in the Commonwealth and issue a report.[12] All parties to this case participated in a public hearing held by the department on September 30, 2003.[13] On November 28, 2003, the department issued its report and recommendations to the Legislature. See Report of the Department of Telecommunications and Energy Relative to Reducing the Number of Double Utility Poles Within the Commonwealth, D.T.E. 03-87 (2003) (Report). In the Report, the department recommended "continued [S]tatewide enforcement of [§ 34B], in order to ensure uniform and efficient services to the public." *Id.* at 7. The department reasoned that individual "by-laws enforcing the removal of poles and the transfer of wires, while designed to further legitimate local interests, would frustrate this fundamental policy." *Id.* at 9. The

law . . . ."

[11]The pole lifecycle management (PLM) system is an Internet-based database that provides electronic notification to pole users when it is their turn to transfer facilities to a new pole. All pole users, including municipalities, have access to the PLM system and the online tracking service that allows pole users and owners to enter updates and view the status of their respective attachments and poles. The PLM system was placed into service on February 22, 2003.

[12]Statute 2003, c. 46, § 110, provides in pertinent part: "[W]ithin 120 days of the effective date of this act, the [department] shall hold a public hearing and issue a report relative to reducing the number of double poles within the commonwealth pursuant to [§ 34B]. . . . The department shall report . . . its recommendations and proposed legislation to provide penalties for the enforcement of this section. The department shall also provide an analysis of whether local enforcement by ordinance or by-law is preferable to statewide enforcement of this section."

[13]The plaintiffs provided the department with written comments following the hearing, as requested. Although the town did not submit written comments, its administrator stated at the hearing, "Bedford is very interested in receiving the authority to fine the utility companies when they do not comply with [§ 34]. We actually have drafted a bylaw that would accomplish this."

department declined the Legislature's invitation to propose enforcement legislation, such as "a penalty mechanism." *Id.* at 15. The department expressed its hope that "additional experience with the operation of the PLM" system, "in operation for less than one year," would help it "identify the root causes of the double pole problem in Massachusetts so that any penalties can be properly targeted."[14] *Id.* Because "pole owners also must demonstrate that they are complying with [§ 34B]," the department reported that it "will require pole owners to file semi-annual reports on the status of double poles" and "submit within 60 days of this Report detailed plans for eliminating the backlog of double poles as soon as reasonably practicable." *Id.* at 15-16.

On October 27, 2003, before the department had issued the Report, the town voted to add § 46.23 (bylaw) to its General Bylaws, imposing a penalty on pole owners of $100 per day for each double pole set existing in Bedford for more than ninety days.[15] The bylaw was reviewed and approved by the Attorney General, pursuant to G. L. c. 40, § 32, and became effective on

---

[14]The department found that "pole owners credibly allege that double pole removal is often delayed by the failure of [users] to transfer their facilities in a timely manner." Report of the Department of Telecommunications and Energy Relative to Reducing the Number of Double Utility Poles Within the Commonwealth, D.T.E. 03-87, at 16 (2003) (Report). As of February 20, 2004, it was the town's turn to transfer fire alarm facilities from eighty-five of 272 old poles not yet ready to be removed in Bedford. In contrast, it was the plaintiffs' turn to move facilities from forty-two of the poles. The department suggested that "an amendment to [§ 34B] apportioning some responsibility to the [users] may be necessary in order to provide all parties with the incentive" to transfer their facilities promptly and that when "a municipality is unable to transfer its facilities in a timely manner, and thereby contributes to a delay in removing a double pole, a waiver from the requirements of [§ 34B] for the pole owner might be appropriate." *Id.* at 16, 17-18.

[15]Section 46.23 of the Town of Bedford General Bylaws, entitled "Prompt Removal of Utility Poles," provides in pertinent part: "Consistently with the provisions of [G. L. c. 164, § 34B], an electric distribution company or telephone company engaging in the removal of an existing pole and the installation of a new pole in place thereof shall complete the transfer of wires, all repairs and the removal of the existing pole from the site within 90 days from the date of installation of the new pole or within 90 days from the effective date of this bylaw, whichever is later . . . .

"Violations of the terms of this bylaw provision shall be punishable by a penalty of one hundred dollars for each pole for each day of violation. This section of the Bylaws may be enforced by a non-criminal citation pursuant to

November 14, 2003.[16] The ninety-day grace period after which the town could impose fines against pole owners pursuant to the bylaw expired on February 14, 2004. As of February 23, 2004, 334 double pole sets existed in Bedford, all jointly owned by the plaintiffs. According to the town, several of the double pole sets create specific safety and aesthetic concerns.[17] The plaintiffs contend that the old poles in question have since been removed, or that any delay in removing them is due to the town's delays in moving its fire alarm facilities to the new poles. See note 14, *supra.*

On February 10, 2004, the plaintiffs filed a complaint in the Superior Court seeking a preliminary injunction, temporary restraining order, and permanent injunction enjoining the town from enforcing the bylaw against them.[18] The plaintiffs also sought declaratory judgment invalidating the bylaw. After a hearing, the judge denied the plaintiffs' motion for injunctive relief, but stayed the order until the town "certifies that all of its facilities have been removed from the old poles."

Following a hearing on the parties' cross motions for summary judgment, a judge in the Superior Court allowed the plaintiffs' motion and denied the town's motion on August 12, 2004.[19]

2. *Discussion.* "Municipalities may not adopt by-laws or ordinances that are inconsistent with State law." *Boston Gas Co.* v. *Newton,* 425 Mass. 697, 699 (1997). Accord *Boston Gas*

[G. L. c. 40, § 21D], by any police officer, the Inspector of Buildings or the Director of Public Works of the Town."

[16]General Laws c. 40, § 32, provides in pertinent part: "[B]efore a by-law takes effect it shall be approved by the attorney general . . . after the clerk of the town . . . has submitted to the attorney general a certified copy of such by-law with a request for its approval, a statement clearly explaining the proposed by-law . . . and adequate proof that all of the procedural requirements for the adoption of such by-law have been complied with."

[17]Several double poles "obstruct drivers' vision," and at least "one group of poles intrudes into the traveled way . . . creating a hazard for vehicles and cyclists." Moreover, several "sets of double poles are no longer attached in the ground yet carry high voltage wires." The town also asserts that double poles are "an unsightly blight for historic towns such as Bedford."

[18]There is no indication in the record that the town has sought to impose fines on the plaintiffs pursuant to the bylaw.

[19]The judge also denied the town's motion to strike the Report from the record. The town does not appeal from this aspect of the decision.

*Co.* v. *Somerville,* 420 Mass. 702, 703 (1995), and cases cited. See note 3, *supra.* "To determine whether a local ordinance is inconsistent with a statute, this court has looked to see whether there was either an express legislative intent to forbid local activity on the same subject or whether the local regulation would somehow frustrate the purpose of the statute so as to warrant an inference that the Legislature intended to preempt the subject." *Boston Gas Co.* v. *Newton, supra,* quoting *Boston Gas Co.* v. *Somerville, supra* at 704. Accord *Bloom* v. *Worcester,* 363 Mass. 136, 155-156 (1973). "Moreover, in some circumstances we can infer that the Legislature intended to preempt the field because legislation on the subject is so comprehensive that any local enactment would frustrate the statute's purpose." *Boston Gas Co.* v. *Somerville, supra.* See *Wendell* v. *Attorney Gen.,* 394 Mass. 518, 527-528 (1985). See also *New England Tel. & Tel. Co.* v. *Lowell,* 369 Mass. 831, 834-835 (1976) (inferring intent to preempt from comprehensive legislative scheme).

"We have stated that the purpose of G. L. c. 164," which governs manufacture and sale of gas and electricity, "is to ensure uniform and efficient utility services to the public." *Boston Gas Co.* v. *Newton, supra* at 699. Accord *Boston Gas Co.* v. *Somerville, supra* at 706. See *New England Tel. & Tel. Co.* v. *Lowell, supra* at 834 (emphasizing "desirability of uniformity of standards applicable to utilities" regulated by department). We have also concluded that, given the "comprehensive nature" of G. L. c. 164, "the Legislature intended to preempt local entities from enacting legislation in this area." *Boston Gas Co.* v. *Somerville, supra* at 704. See *Fafard* v. *Conservation Comm'n of Bar.\stable,* 432 Mass. 194, 204 (2000), citing *Boston Gas Co.* v. *Newton, supra* at 699 (thorough State regulation of public utilities industry preempts local ordinance), and *Boston Edison Co.* v. *Boston,* 390 Mass. 772, 774 (1984) (recognizing comprehensiveness of G. L. c. 164).

The town makes no argument that persuades us that the rule announced in our earlier cases should not apply to the bylaw. Although there is no express legislative intent to forbid local activity regarding double pole removal, the "comprehensive nature" of G. L. c. 164 implies that the Legislature intended to preempt municipalities from enacting legislation on the subject.

We reject the town's assertion that the Legislature's enactment of statutes authorizing municipalities to exert limited control over utilities and utility poles evinces an intent to allow bylaws such as the one at issue here.[20] Cf. note 3, *supra*. These express grants of authority are instead strong evidence that the Legislature intended to preempt local activity on the subject absent an affirmative grant. See, e.g., *Boston Gas Co.* v. *Newton, supra* at 703 (G. L. c. 164, § 75, "provides limited authority to a municipality and must yield at times to the broader grant of authority given to the department"); *Boston Gas Co.* v. *Somerville, supra* at 706 (municipality "cannot use its limited authority [pursuant to G. L. c. 164, § 75,] to enact an ordinance which has the practical effect of frustrating the fundamental State policy of ensuring uniform and efficient utility services to the public").

No statute grants authority to the town to enforce G. L. c. 164, § 34B, by imposing a fine on pole owners or otherwise. To the contrary, the Legislature's comprehensive delegation of regulatory authority to the department[21] and its directive that the department study and report on the double pole issue and

---

[20]See, e.g., G. L. c. 86, § 7 (authorizing municipalities to remove unused poles, wires, structures, and other appliances at owners' expense); G. L. c. 164, § 75 (authorizing municipalities to "regulate, restrict and control all acts and doings of a corporation subject to this chapter which may in any manner affect the health, safety, convenience or property" of inhabitants); G. L. c. 166, § 22B (authorizing municipalities to hold public hearings to determine whether public health, safety, convenience, or welfare would be advanced by prohibiting new installation or construction, or progressive removal, of poles); G. L. c. 166, § 25 (authorizing municipalities to establish regulations for erection and maintenance of telephone, telegraph, and electrical lines and requiring utility companies to obtain municipality's consent before erecting such lines); G. L. c. 166, § 22G (authorizing municipalities to grant special permission for emergency erection of overhead wires).

[21]See, e.g., G. L. c. 159, § 10 (authorizing department to enforce c. 159, which governs common carriers), § 12 (granting department general supervisory and regulatory authority, and jurisdiction and control, over telecommunications systems); G. L. c. 164, § 76 (granting department supervisory authority over all gas and electric companies, including overseeing statutory compliance), § 76C (authorizing department to promulgate rules and regulations to carry out administration of c. 164), § 78 (requiring department to notify Attorney General of any utility's failure to comply with c. 164 or department's own lawful orders), § 79 (authorizing department to obtain judicial enforcement of c. 164 provisions or its own lawful orders); G. L. c. 166, § 25A (authorizing department to regulate rates, terms, and conditions

propose legislation to penalize noncompliance with § 34B, see note 12, *supra*, demonstrate the Legislature's intent that the department enforce § 34B on a Statewide basis in the absence of specific contrary legislation. We agree with the motion judge that "[t]he Legislature's request . . . is powerful evidence of legislative intent to delay the imposition of penalties until [the Legislature] had considered the findings of the [department]. It is also evidence that the Legislature intended to take the findings of the [department] into account, or to at least consider [its] recommendations, before allowing local regulation over the double pole problem."

The Report, in which the department recommended "leaving the Department authority intact" and "continued [S]tatewide enforcement of [§ 34B] in order to ensure uniform and efficient services to the public," confirms the department's recognition of its Statewide authority to ensure that regulated utilities comply with § 34B. See Report, *supra* at 7, 9. "We afford substantial deference to an agency's interpretation of a statute that it is charged with administering." *Franklin W. Olin College of Eng'g* v. *Department of Telecomm. & Energy*, 439 Mass. 857, 861 (2003). See *Iodice* v. *Architectural Access Bd.*, 424 Mass. 370, 373 (1997) ("In examining the extent of the board's powers, we accord deference to the board's own construction thereof and construe such powers so as to facilitate the agency's function as designated by the Legislature"). See also *MCI Telecomm. Corp.* v. *Department of Telecomm. & Energy*, 435 Mass. 144, 150-151 (2001), quoting *Stow Mun. Elec. Dep't* v. *Department of Pub. Utils.*, 426 Mass. 341, 344 (1997) ("Where, as here, the case involves interpretation of a complex statutory and regulatory framework, '[w]e give great deference to the department's expertise and experience in areas where the Legislature has delegated to it decision making authority' ").

The Report describes how local regulations such as the bylaw at issue here would frustrate the goal of G. L. c. 164 to ensure uniform and efficient utility services to the public. The department concluded that a "statutory grant to authorize municipal regulation of double poles is likely to see substantial variation

applicable to utility pole attachments, requiring it to consider interests of cable television, telecommunications, and utility service subscribers).

in implementation and enforcement by the 351 cities and towns
. . . a risk that is easily avoided by leaving the Department
authority intact." Report, *supra* at 9. Comments made by of-
ficials from several towns as part of the public hearing, who
proposed different ways to penalize noncompliance, amply sup-
port this conclusion.[22] The department explained that "pole
owner compliance with differing municipal requirements could
increase costs to pole owners" and ultimately to consumers,
because "[c]osts associated with poles, the replacement and
removal of poles, and the related transfer of wires, are normally
included in the utility's rates, and are subject to Department
review and approval pursuant to the Department's ratemaking
authority." Report, *supra* at 7-8, 9, citing G. L. c. 159, §§ 14,
17, 19, 20; and G. L. c. 164, § 94. See *Boston Gas Co.* v.
*Newton, supra* at 703 n.13 ("Clearly, the differences between
the municipalities in assessing costs impedes . . . uniformity
. . . moreover, where the system becomes less uniform, such
balkanization is likely to lead to less efficient services"). In
short, local enforcement of § 34B would force pole owners to
divert resources from the primary task of double pole removal
to the ancillary task of conforming the removal process to vary-
ing local ordinances and bylaws, increasing the cost of utility
services to consumers without providing concomitant benefits
over Statewide enforcement.

Other considerations persuade us that local enforcement of
§ 34B would frustrate the intent of G. L. c. 164 to ensure
uniform and efficient utility services. Local enforcement could
lead to a system dominated by inappropriate economic incen-

---

[22]The Report summarized these comments: "Stoneham argues that if the
existing law is amended to provide municipalities with the right to impose
civil fines, then the current state limit on fines and penalties a municipality
can impose (i.e., $300 pursuant to G. L. c. 40, § 21) is far too low to be an
effective deterrent. . . . Lexington recommends that the penalty structure
consist of a daily fine, increasing over time for each day a pole owner is in
violation of the statute (e.g., $20 per day [for the] first 30 days, $30 per day
for the second 30 days, and $40 per day thereafter). . . . Milton, on the other
hand, suggests that a fine of $100 per day is necessary to provide an effective
deterrent . . . . Lexington further recommends a 'stop the clock' provision
when calculating fines or penalties to allow for conditions beyond a utility
company's control that would prevent the removal of the double pole within
the statutory 90-day deadline (e.g., natural disasters or labor actions)." Report,
*supra* at 11-12.

tives that compel pole owners to devote resources to those cities and towns where the penalties are the most onerous. One town may increase its fines above those imposed by other municipalities to persuade pole owners to shift their focus to removing the poles within its borders. Permitting a town to manipulate the prioritization of pole removal to the disadvantage of other municipalities would threaten the provision of uniform and efficient utility services to the public. Unlike the department, an individual city or town seeking to further its purely local interests does not weigh the often competing interests of pole owners, pole users, utility consumers throughout the State, and other municipalities, a task necessary to craft a uniform and efficient approach to double pole removal. See *Pereira* v. *New England LNG Co.*, 364 Mass. 109, 119 (1973), quoting *New York Cent. R.R.* v. *Department of Pub. Utils.*, 347 Mass. 586, 592 (1964) ("Legislature intended a broad and balanced consideration of all aspects of the general public interest and welfare and not merely examination of the local and individual interests").

*Judgment affirmed.*