448 Mass. 45 (2006)                                           45

Alliance to Protect Nantucket Sound, Inc. *v.* Energy Facilities Siting Board.

## ALLIANCE TO PROTECT NANTUCKET SOUND, INC. *vs.* ENERGY FACILITIES SITING BOARD & another.[1]

Suffolk. November 9, 2006. - December 18, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Energy Facilities Siting Board. Administrative Law,* Decision, Evidence, Hearing. *Due Process of Law,* Adjudicatory proceeding, Notice. *Public Utilities,* Electrical transmission line. *Electricity.*

This court concluded that the Energy Facilities Siting Board (board) properly conditioned its approval of a petition to build and operate certain underground and undersea electric transmission lines on the submission by one of the petitioning parties — a corporation that sought to construct an offshore wind-powered energy generating facility (wind farm) utilizing the proposed transmission lines — of copies of all Federal, State, and local permits necessary to begin building the wind farm, where the board's decision to implement a new method for determining the need for the proposed transmission lines, and the timing of that decision, was within the board's discretion, in that the board gave the interested parties sufficient notice of the issues involved to afford them reasonable opportunity to prepare and present evidence and argument [50-52]; and where the board's decision to issue a conditional permit did not constitute an improper delegation of its responsibilities [52-56].

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on June 7, 2005.

The case was reported by *Greaney,* J.

*Lawrence P. Heffernan* (*Kristine E. Kraushaar* with him) for the plaintiff.

*Edward J. DeAngelo,* Special Assistant Attorney General, for the defendant.

*David S. Rosenzweig* (*Erika J. Hafner* with him) for the intervener.

*Susan M. Reid,* for Conservation Law Foundation, Inc., amicus curiae, submitted a brief.

GREANEY, J. The Energy Facilities Siting Board (board)

---

[1]Cape Wind Associates, LLC, intervener.

conditionally approved a petition filed jointly by Cape Wind Associates, LLC (Cape Wind), and Commonwealth Electric Company, doing business as NSTAR Electric (NSTAR) (together, applicants), to build and operate two 115 kilovolt underground and undersea electric transmission lines approximately eighteen miles in length. The transmission lines would connect an offshore wind-powered energy generating facility (wind farm) proposed for construction by Cape Wind in Federal waters off Nantucket Sound with the existing New England regional electric power grid. The board conditioned its approval on the submission by Cape Wind of copies of all Federal, State, and local permits necessary to begin building the wind farm. The Alliance to Protect Nantucket Sound, Inc. (Alliance), intervener in the administrative proceedings below, appealed from the board's decision to a single justice of this court, pursuant to G. L. c. 25, § 5, and G. L. c. 164, § 69P. The single justice reserved and reported the case without decision to the full court.[2] We affirm the decision of the board.

1. The background necessary to decide this appeal is as follows. The board is an independent review board established within the department of telecommunications and energy and charged by the Legislature with administering the provisions contained in G. L. c. 164, §§ 69H through 69Q. See G. L. c. 164, § 69H. The approval of the board is required prior to the commencement of construction of any "facility"[3] or "generating facility"[4] in the Commonwealth, and no State agency may issue a construction permit for any such facility un-

---

[2] The single justice granted intervener status to Cape Wind Associates, LLC (Cape Wind). In its brief to this court, Cape Wind makes arguments substantially similar to those made by the Attorney General on behalf of the Energy Facilities Siting Board (board).

[3] The definition of a "facility" contained in G. L. c. 164, § 69G, includes, in relevant part, "(1) a generating facility; (2) a new electric transmission line having a design rating of [sixty-nine] kilovolts or more and which is one mile or more in length on a new transmission corridor; [and] (3) a new electric transmission line having a design rating of 115 kilovolts or more which is [ten] miles or more in length on an existing transmission corridor except reconductoring or rebuilding of transmission lines on the same voltage."

[4] A "generating facility" is defined in G. L. c. 164, § 69G, as "any generating unit designed for or capable of operating at a gross capacity of [one hundred] megawatts or more, including associated buildings, ancillary structures, transmission and pipeline interconnections that are not otherwise facilities, and fuel storage facilities."

less the petition to construct the facility has already received approval from the board. See G. L. c. 164, §§ 69J, 69J ¼. The board's governing mandate, set forth in § 69H, is to "provide a reliable energy supply for the commonwealth with a minimum impact on the environment at the lowest possible cost." To accomplish this purpose, on the receipt of a petition for approval of construction of an energy facility at a site, the board is obliged to

> "review the need for, cost of, and environmental impacts of transmission lines, natural gas pipelines, facilities for the manufacture and storage of gas, and oil facilities; provided, however, that the board shall review only the environmental impacts of generating facilities, consistent with the [C]ommonwealth's policy of allowing market forces to determine the need for and cost of such facilities. Such reviews shall be conducted consistent with [§ 69J ¼] for generating facilities and with [§ 69J] for all other facilities."

G. L. c. 164, § 69H.

The Legislature significantly altered the scope of the board's governing mandate when it enacted St. 1997, c. 164 (1997 Restructuring Act). Prior to that time, the board was charged to "provide a necessary energy supply for the [C]ommonwealth with a minimum impact on the environment at the lowest possible cost." G. L. c. 164, § 69H, as amended through St. 1992, c. 141, § 9. Consistent with this charge, the board's review typically focused on whether there was a "need" for the proposed energy facilities. In 1988, the board developed an analysis specific to determining the "need" for transmission lines that connect to generating facilities that fall outside the board's jurisdiction. That standard, set forth in the board's decision relative to a petition to construct a 1.2 mile overhead electric transmission line submitted by Turners Falls Limited Partnership, directed the board to consider whether the energy from the new generator was needed to improve the reliability of the power supply system, or to increase economic efficiency, by analyzing (1) whether there was a need within New England for the power generated by the non-jurisdictional generating facil-

ity, and (2) whether the transmission lines would provide benefits to Massachusetts. (We shall refer to this standard, as do the parties and the board, as the Turner Falls standard.)

As indicated, in 1997, the Legislature eliminated language in § 69H requiring the board to review the "need" for power to be generated by proposed facilities. The 1997 Restructuring Act also added a new provision to G. L. c. 164 to govern the board's review of proposed generating facilities. That provision, § 69J 1/4, explicitly states that "[n]othing in this chapter shall be construed as requiring the board to make findings regarding the need for, the cost of, or alternative sites for a generating facility" (except in limited circumstances not relevant here) and prohibits the board from seeking data relative to "the necessity for, or cost of, [a] proposed generating facility."

2. We now recite the facts leading to this appeal. On September 17, 2002, the applicants filed the joint petition to construct and operate transmission lines consisting of two parallel electrical circuits, each made up of two cables and six conductors. The transmission lines would begin at an existing 115 kilovolt switching station in Barnstable and run underground through Barnstable and Yarmouth. The lines then would run under the sea floor from Lewis Bay in Yarmouth, through Nantucket Sound, to the site of the proposed wind farm. The route is approximately eighteen miles in length. Approximately twelve miles of each circuit would be undersea, buried in a trench in the sea bottom about twenty feet apart. At landfall, both circuits would feed into a single underground duct bank for the remainder of the route (approximately six miles), which would terminate at the utility switching station in Barnstable. About half of the undersea portion of the transmission lines would be located outside the three-mile offshore Massachusetts boundary and so under waters controlled by the United States government.

The area in which the wind farm itself is proposed to be built is located in Federal waters and, thus, falls beyond the scope of the board's jurisdiction and this case. As described in the record, the wind farm would consist of 130 wind turbine generators and an electrical service platform. The wind turbines each would be approximately 420 feet in height from the water to the

top of the blade. The wind turbines would be sited over approximately twenty-four square miles of Horseshoe Shoal in Nantucket Sound and connected, by undersea cables, to a service platform which would house an electric transformer. The closest land locations in different directions from the wind farm include Point Gammon in Yarmouth, 4.7 miles to the north; Cape Poge on Martha's Vineyard, 5.5 miles to the southwest; and points in Nantucket approximately eleven miles to the south and southeast.

On December 20, 2002, the board granted intervener status to five entities, including the Alliance.[5] The board accepted prefiled testimony and held twenty-one days of evidentiary hearings, which concluded on October 21, 2003. After the close of the evidentiary hearings, the board sought comments and arguments from the parties on the proper standard of review to be applied to the petition in light of changes to the language of § 69H, and the addition of § 69J $\frac{1}{4}$, effected by the 1997 Restructuring Act. In response, the parties submitted briefs indicating their respective positions on appropriate revisions to the Turner Falls standard. On December 18, 2003, the board closed the evidentiary record. On July 2, 2004, the board's presiding officer issued a tentative decision for board approval, and the parties, and the public, were given an opportunity for comment. The board entered its final decision on May 11, 2005.

In its decision, the board concluded that the applicants had successfully demonstrated that (1) the transmission lines will be needed if the wind farm is built; (2) the proposed transmission line project was superior to alternative approaches in terms of cost, environmental impact, reliability, and ability to address the identified needs; and (3) the proposed primary route was superior to the alternative routes in terms of cost, environmental impact, and reliability of supply. Only the first conclusion, concerning the need for the transmission lines, is at issue.

With respect to that conclusion, the board found that "the total capacity of all existing transmission cable in Nantucket

---

[5]The town of Yarmouth, the Massachusetts Department of Environmental Management Ocean Sanctuaries Program, Save Popponesset Bay, Inc., and the Massachusetts Audubon Society also were granted intervener status, but they take no part in this appeal.

Sound would be insufficient to transmit the output of the proposed wind farm, even if they would be totally dedicated to that purpose." Recognizing that the wind farm proposal was still in the initial stages of permitting, however, the board could not "find that the wind farm will be available to contribute to the regional energy supply." In order to ensure that the transmission lines are not built unnecessarily, the board determined that construction on the lines could not begin until Cape Wind had successfully obtained permits required to begin construction of the wind farm. Accordingly, the board approved the petition to construct the transmission lines subject to compliance by the applicants with the condition that, prior to the commencement of construction, "Cape Wind shall submit to the [board] copies of all permits required for Cape Wind to begin installation of wind farm equipment in Nantucket Sound." The board clarified that, "[b]ecause the issues addressed in this [d]ecision relative to this facility are subject to change over time, construction of the proposed facility must commence within three years of the date of the decision," and that the applicants must notify the board of "any changes other than minor variations to the proposal."

3. Alliance does not contest the accuracy of the board's determination that, if Cape Wind receives the necessary permits from Federal and State agencies and if, therefore, its proposed construction of the wind farm goes forward, there will be a "need" for the transmission lines, as that term is used in the board's authorizing statute. The Alliance objects, however, to (a) the timing of the board's decision to deviate from the Turners Falls standard to arrive at the determination of "need," and (b) the contingent nature of the board's decision. On the basis of these objections, the Alliance requests that we vacate the board's decision and remand the matter for further proceedings.[6] We address these arguments in turn.

---

[6]The Alliance asserts that the board committed two other errors that should be corrected on remand. These alleged errors are that the board erred (1) in denying the Alliance's motion to reopen the record to include the draft environmental impact report (DEIR) on the wind farm project; and (2) in failing to require Cape Wind to produce specific financial information as required by G. L. c. 164, § 69J. The Alliance makes these assertions without citation or convincing argument, and we consider them only briefly. As for the first, a

The scope of our review is limited to "whether the decision of the board is in conformity with the [C]onstitution of the [C]ommonwealth and the [C]onstitution of the United States, was made in accordance with the procedures established under [G. L. c. 164, §§ 69H-69O,] and with the rules and regulations of the board with respect to such provisions, was supported by substantial evidence of record in the board's proceedings; and was arbitrary, capricious or an abuse of the board's discretion under the provisions of [§ 69H] to [§ 69O]." G. L. c. 164, § 69P. Consistent with well-established principles of administrative law, we give great deference to the board's expertise and experience. See *Box Pond Ass'n* v. *Energy Facilities Siting Bd.*, 435 Mass. 408, 412 (2001). The Alliance bears the burden of proving that the decision is invalid, and that burden is a heavy one. See *id.*; G. L. c. 25, § 5.

a. The decision to announce a new approach by which it would henceforth determine the need for proposed transmission lines, and the timing of that decision, was within the board's discretion. "It is a recognized principle of administrative law that an agency may adopt policies through adjudication as well as through rulemaking." *Arthurs* v. *Board of Registration in Medicine*, 383 Mass. 299, 312-313 (1981), citing *Securities & Exch. Comm'n* v. *Chenery Corp.*, 332 U.S. 194, 201-203 (1947). See *Massachusetts Elec. Co.* v. *Department of Pub. Utils.*, 383 Mass. 675, 679 (1981). The parties in this case were aware that the 1997 Restructuring Act had changed the rules with respect to the manner in which the board evaluates the need for proposed energy facilities. All agreed that the approach adopted

decision whether to reopen the record is a matter within the board's discretion. See *Box Pond Ass'n* v. *Energy Facilities Siting Bd.*, 435 Mass. 408, 417 (2001). The record demonstrates that the board carefully examined the merits of doing so and properly concluded that it was not warranted. We import no significance to the fact that the final decision, issued on May 11, 2005, included a finding that the DEIR had not yet been completed when the report had, in fact, been issued in November, 2004. The finding was correct on December 18, 2003, the date the evidentiary record was closed. As for the second, even assuming that the statutory language may fairly be read in the manner urged by the Alliance, the substantial deference owed to an agency's interpretation of a statute it is charged to enforce includes approving an interpretation of statutory language that may be read in two ways. See *Boston Edison Co.* v. *Bedford*, 444 Mass. 775, 783 (2005), and cases cited.

by the board in 1988, in the Turners Falls decision, was no longer viable. The board heard evidence and then invited the parties to address, in post-hearing briefs, the legal question of the appropriate standard to replace that of Turners Falls. By proceeding in this manner, the board was able to consider the legal question in a specific factual context. The board's decision to wait until after the evidentiary record was complete maximized the likelihood that the standard it developed would be workable and grounded in the evidence. We reject the Alliance's contention that the board misled the parties to rely on the Turners Falls standard.

An agency conducting an adjudicatory proceeding is required to give all parties "sufficient notice of the issues involved to afford them reasonable opportunity to prepare and present evidence and argument." G. L. c. 30A, § 11 (1). See *LaPointe v. License Bd. of Worcester*, 389 Mass. 454, 458 (1983) ("Due process requires that, in any proceeding to be accorded finality, notice must be given that is reasonably calculated . . . to afford [an interested party] an opportunity to present his case"). If the board had created a new standard that required substantive fact finding, it clearly could not have done so without giving notice to the parties and granting each a fair opportunity to prepare arguments and submit evidence in order to meet that standard. See *Boston Gas Co. v. Department of Pub. Utils.*, 405 Mass. 115, 120-121 (1989). That is not what happened here. The Alliance cannot seriously claim that it lacked reasonable notice of the substance of the issues or a chance to prepare its case. See *Strasnick v. Board of Registration in Pharmacy*, 408 Mass. 654, 660-661 (1990); *Fitchburg Gas & Elec. Light Co. v. Department of Pub. Utils.*, 395 Mass. 836, 844-846 (1985); *New England Tel. & Tel. Co. v. Department of Pub. Utils.*, 372 Mass. 678, 686 (1977).

b. There was nothing improper in the board's decision to issue a conditional permit. See *Mello v. License Comm'n of Revere*, 435 Mass. 532, 534 (2001). On the contrary, the board's decision was an effective method to accomplish its statutory obligation to determine whether there was a need for the proposed transmission lines. See *Andover v. Energy Facilities*

*Siting Bd.*, 435 Mass. 377, 381 (2001).[7] As has been discussed, in light of the 1997 Restructuring Act, the board could no longer consider, pursuant to the Turners Falls standard, the need for the generating facility that the proposed transmission lines would serve. To ensure that a proposed transmission line is needed, or, in the words of the board, to ensure that the "transmission line, with its attendant costs and potential construction and permanent impacts, is not built unnecessarily," the board stated that it would consider (1) whether the "existing transmission system is inadequate to interconnect the new or expanded generator" and (2) whether the "new or expanded generator is likely to be available to contribute to the regional energy supply." When the proposed generating facility is subject to the board's jurisdiction, the required showing "may be made by obtaining the [board's] approval of the generating facility."

In circumstances such as the present case, when the proposed generating facility is beyond the board's jurisdiction, the board determined, "the showing may be made on a case-by-case basis based on indicators of project progress (e.g., progress in permitting or in obtaining project financing)." This approach is particularly appropriate if the generating facility (here, the wind farm) is within the jurisdiction of the United States government, and Federal agencies will be making critical decisions about its permitting. An attempt by the board to predict the decisions of Federal agencies would constitute an exercise in administrative inefficiency and waste the time and effort of the board and the applicants. If the board incorrectly predicted that the wind farm would not get its permits, then the transmission lines would have been unnecessarily rejected. If it incorrectly predicted that the wind farm would get its permits, then it would have permit-

---

[7] In *Andover* v. *Energy Facilities Siting Bd.*, 435 Mass. 377 (2001), we affirmed the board's approval of a petition to construct and operate an electrical generating facility in the town of Dracut. The board's decision in that case deferred setting emission limits for the proposed facility until the department of environmental protection issued its final air plan approval. See *id.* at 380. Opponents argued that the board's decision constituted an improper abdication of its statutory responsibility, under G. L. c. 164, § 69J ¼, to establish "final, binding emissions limits for the proposed facility." We concluded that, far from being improper, the board's decision reflected "an accurate observation of the different roles of the board and [other Federal and State] agencies in the over-all permit process." *Id.* Such is the case here.

ted the construction of the transmission lines to go forward unnecessarily. To defer ruling on the transmission lines until after the wind farm had received all of its permits (a course of action supported by the Alliance) would be inconsistent with the statutory scheme, which contemplates that the board will be the first State agency to act. See G. L. c. 164, § 69J. The board cannot act with absolute finality, however, when it cannot predict what other permitting Federal and State agencies will do. See *Andover* v. *Energy Facilities Siting Bd., supra* at 380.

The Alliance attacks the board's decision as an "improper delegation of its statutory duty to make an independent finding of need." We disagree. Based on the evidentiary record, the board made clear findings, which the Alliance does not challenge, that the "total capacity of all existing transmission cables in Nantucket Sound would be insufficient to transmit the output of the proposed wind farm, even if they could be totally dedicated to that purpose" and that "the existing transmission system is inadequate to interconnect the proposed wind farm." At that point in time when Cape Wind submits to the board copies of all permits required to commence construction of the wind farm, the need for the proposed transmission lines will be conclusively established. Rather than improperly delegating its responsibilities, the board has, in effect, imposed a heightened standard of proof on the applicants.[8]

The Alliance relies on our decision of *Point of Pines Beach Ass'n* v. *Energy Facilities Siting Bd.*, 419 Mass. 281, 285-286 (1995), as support for its position that the conditional nature of the board's decision was unlawful. This reliance is misplaced. In the *Point of Pines Beach Ass'n* case, the board had approved a petition for the construction of a gas-fired power generating facility by Altresco Lynn, Inc. (Altresco). The statutory language

---

[8]Recognizing that its analysis ventured into new territory, and cognizant of the value of precedent in its past decisions, the board conducted a lengthy alternative review of the proposed wind farm and concluded that the applicants had established a need for the proposed transmission lines consistent with the Turner Falls standard. Although the board's cautioned approach is understandable, its analysis under the Turner Falls standard has no legal effect. This is so because, as has been discussed, G. L. c. 164, §§ 69H and 69J ¼, explicitly prohibit the board from seeking data regarding the need for, or cost of, a proposed generating facility, except in certain narrowly defined circumstances.

applicable to the board's approval at that time[9] required that it be based on a finding that the proposed project would "provide a *necessary energy supply for the commonwealth* with a minimum impact on the environment at the lowest possible cost" (emphasis added). G. L. c. 164, § 69J, as amended through St. 1992, c. 141, § 15. The board stated in its decision that the record was "unclear regarding the ability of Massachusetts utilities to acquire surplus supplies from out-of-state providers" and concluded that, "based on the record, the [board] is unable to determine that the proposed project is needed to provide a necessary energy supply for the Commonwealth prior to the year 2000." *Id.* at 283-284. The board nevertheless approved the petition, subject to the condition that Altresco submit to the board, within four years, a contract with Boston Edison Company, signed and approved by the department of public utilities, or signed and approved long-term purchase agreements from other buyers, to purchase a specified percentage of the proposed facility's power output. See *id.* at 282-283. The board argued that approved power purchase agreements satisfactorily established the required finding of need. We disagreed and vacated the board's decision, reasoning that (1) although the existence of power purchase agreements may demonstrate the *utility's* need for power, such agreements would not establish the *Commonwealth's* need for power, as required by the statute, and (2) the department's approval of a power purchase agreement does not, by itself, warrant an inference of Commonwealth need. See *id.* at 285-286, citing *New Bedford* v. *Energy Facilities Siting Council*, 413 Mass. 482, 489-490 (1992). It was not the conditional nature of the board's decision that rendered it invalid, but the board's inability to find a future need in the Commonwealth for the proposed generating facility. As stated, the Alliance does not quarrel with the proposition, as found by

[9]The board issued its decision in 1993, well before the enactment of the electric utility restructuring act, St. 1997, c. 164 (1997 Restructuring Act), changed the board's mandate from providing "a necessary energy supply for the commonwealth" to providing "a reliable energy supply for the commonwealth," St. 1997, c. 164, §§ 204 and 205, and added the provisions of § 69J 1/4, inserted by St. 1997, c. 164, § 210, which now apply to petitions for the construction of new and expanded generating facilities and which expressly do not require a finding of need for the approval of such petitions.

the board, that the transmission lines will be needed to service the wind farm, if and when it is constructed.

It is, of course, true that "[a] party to a proceeding before a regulatory agency, such as the [board,] has a right to expect and obtain reasoned consistency in the agency's decisions." See *Tofias* v. *Energy Facilities Siting Bd.*, 435 Mass. 340, 349 (2001), quoting *Boston Gas Co.* v. *Department of Pub. Utils.*, 367 Mass. 92, 104 (1975). We have stated that the requirement of "reasoned consistency" means only "that any change from an established pattern of conduct must be explained." *Robinson* v. *Department of Pub. Utils.*, 416 Mass. 668, 673 (1993). Here, the board carefully, and adequately, explained its reasons for its decision, including its adoption of the new standard for determining need and the conditional nature of its approval. The board's decision, in our view, is an eminently reasonable and practical approach to the uncommon jurisdictional issues presented by the petition.

4. Judgment shall enter in the county court affirming the decision of the board.

*So ordered.*