SUPREME JUDICIAL COURT 
 
 CONSERVATION LAW FOUNDATION & another[1] vs. ENERGY FACILITIES SITING BOARD & another[2] (and a consolidated case[3])

 
 Docket:
 SJC-13521
 
 
 Dates:
 May 6, 2024 - September 11, 2024
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, & Wolohojian, JJ.
 
 
 County:
 Suffolk
 

 
 Keywords:
 Energy Facilities Siting Board. Public Utilities, Energy company, Electric company, Findings, Judicial review. Electric Company. Environment. Administrative Law, Substantial evidence, Findings, Agency's interpretation of statute, Judicial review. Permit. Department of Environmental Protection.
 
 

             Civil actions commenced in the Supreme Judicial Court for the county of Suffolk on December 19 and 29, 2022.
            The cases were reported by Cypher, J.
            Phelps Turner (Anxhela Mile also present) for Conservation Law Foundation & another.
            Adam M. Ramos, Special Assistant Attorney General (Christine E. Dieter also present) for the respondent.
            David S. Rosenzweig (Catherine J. Keuthen & Cheryl A. Blaine also present) for the intervener.
            Francis E. O'Brien, pro se, was present but did not argue.
            Rosa Hayes & Sommer H. Engels, for Union of Concerned Scientists, amicus curiae, submitted a brief.
            WOLOHOJIAN, J.  The petitioners in these two consolidated actions seek judicial review, pursuant to G. L. c. 164, § 69P, of a decision of the Energy Facilities Siting Board (board) granting a certificate of environmental impact and public interest (certificate) to NSTAR Electric Company, doing business as Eversource Energy (Eversource), in connection with a proposed electric substation in the East Boston section of Boston (substation).  The petitioners raise several arguments on appeal.  First, they argue that the board should not have considered the merits of the petition for a certificate because Eversource failed to make a threshold showing of "undue delay" on the part of two city of Boston (city) agencies.  Second, as to the board's decision regarding the merits of Eversource's petition, they argue that (1) the board failed to consider or properly weigh the environmental justice principles contained in "An Act Creating a Next-Generation Roadmap for Massachusetts Climate Policy" (Next-Generation Roadmap Act), St. 2021, c. 8, §§ 55-60; (2) the board failed to consider (a) the increased cost of the project, (b) the Massachusetts Environmental Policy Act, G. L. c. 30, §§ 61-62H, (c) substantial evidence of risks to public health and safety, (d) substantial evidence that the substation was not in the public interest, and (e) technological and siting alternatives; and (3) the board unlawfully approved a G. L. c. 91 tidelands license for the project.  
            We conclude that the board's decision is lawful, was supported by substantial evidence, and was not arbitrary, capricious, or otherwise an abuse of the board's discretion under the provisions of G. L. c. 164, §§ 69H-69O.  We accordingly affirm.[4]
            1.  Background.  a.  Statutory and regulatory framework.  An electric, gas, or oil company seeking to build a new nongenerating energy facility (applicant) -- such as the proposed substation at issue here -- must receive board approval in order to commence construction.[5]  G. L. c. 164, § 69J.  In addition to receiving construction approval from the board, the applicant must ordinarily obtain the myriad of State and local permits, licenses, and approvals required to build an energy facility.  See Alliance to Protect Nantucket Sound, Inc. v. Energy Facilities Siting Bd., 457 Mass. 663, 689 & nn.38, 39 (2010) (Alliance II) (discussing nine required local and State permits).  When an applicant does not obtain all the necessary State and local approvals and can demonstrate that the failure is a result of certain specified types of hindrance, the applicant may seek relief from the board by filing a petition for a "certificate of environmental impact and public interest" pursuant to G. L. c. 164, §§ 69K-69O.  In such cases, the applicant must show at least one of the following as a threshold requirement before the board will consider the merits of the petition:  (1) constructing the facility according to the standards imposed by a State or local agency is impossible "with commercially available equipment"; (2) construction is prevented by a State or local agency's undue delay for any reason; (3) "there are inconsistencies among resource use permits issued by such [S]tate or local agencies"; (4) a State or local agency has attempted to impose a nonregulatory issue or condition; (5) construction is impossible "due to any disapprovals, conditions or denials by a [S]tate or local agency"; or (6) a "[S]tate or local agency has imposed a burdensome condition or limitation on any license or permit which has a substantial impact on the board's responsibilities."  G. L. c. 164, § 69K.  See 980 Code Mass. Regs. § 6.02 (1993).  Only if the board concludes that the applicant has established one of these threshold circumstances will it consider the merits of the applicant's petition for a certificate.[6]  G. L. c. 164, § 69K.
            If the board concludes that the applicant has satisfied the threshold showing, it must consider and make written findings concerning the following in order to grant a certificate:
"(1) the need for the facility to meet the energy requirements of the applicant's market area taking into account wholesale bulk power or gas sales or purchases or other co-operative arrangements with other utilities and energy policies as adopted by the [C]ommonwealth;
"(2) the compatibility of the facility with considerations of environmental protection, public health and public safety;
"(3) [t]he extent to which construction and operation of the facility will fail to conform with existing [S]tate and local laws, ordinances, by-laws, rules and regulations and reasonableness of exemption thereunder, if any, consistent with the implementation of the energy policies contained in this chapter to provide a necessary energy supply for the [C]ommonwealth with a minimum impact on the environment at the lowest possible cost; and
"(4) the public interest, convenience and necessity requiring construction and operation of the facility."
G. L. c. 164, § 69O.  See 980 Code Mass. Regs. § 6.05 (1993).  In addition, the board is to examine "the good faith effort made by the applicant to obtain from [S]tate agencies and local governments the licenses, permits and other regulatory approvals required by law."  G. L. c. 164, § 69L.  
            The board is obligated to render its decision "[a]s expeditiously as possible but in no event later than six months from the date of filing of the petition."  G. L. c. 164, § 69O.  The board may grant the petition, deny the petition, or grant the petition subject to conditions.  See id.  If granted, the certificate operates as "a composite of all individual permits, approvals or authorizations which would otherwise be necessary for the construction and operation of the facility."  G. L. c. 164, § 69K.
            b.  Prior proceedings.  Eversource first petitioned the board in 2014 to build the substation on a city-owned parcel of land.  In 2017, the board approved its construction, subject to certain conditions, including that Eversource enter into discussions with the city focusing on whether the substation could be relocated on the parcel.  In 2018, after negotiating with the city and an abutter, Eversource submitted a project change petition that proposed to relocate the substation 190 feet from its original location.  The board approved that petition, and we affirmed its decision in GreenRoots, Inc. v. Energy Facilities Siting Bd., 490 Mass. 747, 748 (2022).  
            During the pendency of that appeal, Eversource pursued various local and State permits that would be necessary to complete the relocated project.  Two local agencies, the city's public improvement commission and parks and recreation department, took no action on Eversource's requests for permits, effectively creating a stalemate by each refusing to act until the other had issued its approval.[7]
            Arguing that the agencies' inaction constituted undue delay or, in the alternative, imposed impermissible conditions on approval of the permits, Eversource returned to the board in February 2022 to request a certificate.  If obtained, the certificate would obviate the need for Eversource to pursue approvals from the two local agencies.
            The petitioners in the actions now before us intervened in the ensuing proceedings before the board,[8] participating in discovery, eight days of evidentiary hearings, and multiple rounds of briefing.  On November 30, 2022, the board issued a 199-page decision approving the certificate.  The board found that Eversource had met its threshold burden and that its certificate application satisfied the statutory and regulatory prerequisites by being
"(1) supported by a finding of need for the [s]ubstation, and justified in comparison with local project alternatives such as energy efficiency, photovoltaic generation, and battery energy storage systems; (2) compatible with environmental protection, public health and public safety considerations; (3) in conformance with [S]tate and local laws and that any exemptions are reasonable; (4) consistent with the public interest, convenience and necessity; and (5) consistent with a good faith effort by Eversource to obtain the requested permits from [S]tate and local agencies that ordinarily issue these permits."
These core conclusions were supported by a host of detailed subsidiary findings in the board's comprehensive decision; we do not recite those subsidiary findings here, but we reserve them as necessary for our discussion below.  
            Based on its findings, the board granted Eversource the requested certificate.[9]  In response, the petitioners filed the instant petitions in the county court pursuant to G. L. c. 164, § 69P, and G. L. c. 25, § 5.  A single justice allowed Eversource's motion to intervene in the cases, allowed the parties' joint motion to consolidate the cases, and reserved and reported the cases to the full court.
            2.  Discussion.  a.  Standard of review.  We review the petitioners' numerous points of challenge to the board's decision to determine whether it
"is in conformity with the [C]onstitution of the [C]ommonwealth and the [C]onstitution of the United States, was made in accordance with the procedures established under [G. L. c. 164, §§ 69H-69O,] and with the rules and regulations of the board with respect to such provisions, was supported by substantial evidence of record in the board's proceedings; and was arbitrary, capricious or an abuse of the board's discretion under the provisions of [G. L. c. 164, §§ 69H-69O]."
G. L. c. 164, § 69P.  In so doing "we give great deference to the board's expertise and experience," Alliance to Protect Nantucket Sound, Inc. v. Energy Facilities Siting Bd., 448 Mass. 45, 51 (2006) (Alliance I), and we will not "substitute our judgment or the petitioners' judgment for that of the board," Sudbury v. Energy Facilities Siting Bd., 487 Mass. 737, 738 (2021).  "The petitioners bear the 'burden of proving that the decision is invalid, and that burden is a heavy one.'"  Alliance II, 457 Mass. at 690, quoting Alliance I, 448 Mass. at 51.  
            With these principles in mind, we turn to the petitioners' arguments.  We begin with their claim that the board incorrectly concluded that Eversource met its threshold burden to show one of the statutorily identified forms of State or local agency hindrance.  We then turn to the petitioners' challenges to the issuance of the certificate, including their arguments that the board misidentified and misapplied the environmental justice provisions, improperly approved the equivalent of a G. L. c. 91 tidelands license, and otherwise did not consider (or weighed improperly) evidence regarding the substation.
            b.  Threshold showing of "undue delay" under G. L. c. 164, § 69K.  Eversource's petition asserted that the inaction of two city agencies "unduly delayed" approval of the necessary permits, and that each agency's refusal to review the permit applications until the other had granted approval constituted "a burdensome condition."  See G. L. c. 164, § 69K.  The board found that Eversource had provided the agencies with "sufficient and timely information" to make their decisions, and that the agencies' ensuing failures to act, premised on "procedurally burdensome" and "illogical" requirements, caused "delay . . . [that] undeniably prevented the construction of the [s]ubstation."   Accordingly, the board concluded that Eversource had "established at least one substantively valid basis for . . . consideration" of its certificate application, and it allowed the petition to proceed to a consideration of its merits.  
            We discern no error in the board's determination.  The stalemate created by two local agencies each refusing to act until the other did so was a sufficient basis for the board to find undue delay.  When the regulatory process results in an applicant being trapped between two agencies in an impasse of indefinite duration, the board could permissibly conclude that Eversource had satisfied its threshold burden of showing undue delay.  See G. L. c. 164, § 69O.  
            The petitioners suggest that the board acted prematurely because it acted before either city agency made a final decision.  But where an applicant seeks relief from the board based on undue delay on the part of an agency, a final decision is not required.  See 980 Code Mass. Regs. § 6.02(1).  This makes sense; otherwise, the applicant's ability to seek relief from the board could be held hostage indefinitely by an agency's undue delay.  This is not to say that the board is permitted to act precipitously, or without regard to whether the State or local agency had adequate time to act.  But that is not what happened here.  Instead, the board carefully reviewed the history of Eversource's diligent efforts to obtain approval from the two city agencies and found that neither agency had allowed the permit application before it to move forward by putting it on the agency's agenda, despite Eversource's good faith efforts to satisfy the agencies' demands at every turn.  The evidence permitted the board to find undue delay of indefinite duration.  
            c.  Environmental justice.  We next turn to the petitioners' assertion that the board misinterpreted and misapplied the environmental justice provisions of the Next-Generation Roadmap Act.  The act creates a number of measures designed to advance environmental justice.  See St. 2021, c. 8, §§ 55-60.  See also GreenRoots, Inc., 490 Mass. at 753 ("Environmental justice is based on the principle that all people have a right to be protected from environmental hazards and to live in and enjoy a clean and healthful environment regardless of race, color, national origin, income, or English language proficiency" [quotation omitted]).  Among them is a requirement that agencies "consider the environmental justice principles in making any policy, determination or taking any other action related to a project review."  G. L. c. 30, § 62K, inserted by St. 2021, c. 8, § 60.  "Environmental justice principles" are
"principles that support protection from environmental pollution and the ability to live in and enjoy a clean and healthy environment, regardless of race, color, income, class, handicap, gender identity, sexual orientation, national origin, ethnicity or ancestry, religious belief or English language proficiency, which includes (i) the meaningful involvement of all people with respect to the development, implementation and enforcement of environmental laws, regulations and policies, including climate change policies; and (ii) the equitable distribution of energy and environmental benefits and environmental burdens."
G. L. c. 30, § 62, as amended by St. 2021, c. 8, § 56.
            The petitioners' first argument, that the over-all timeline of the board's proceedings precluded "meaningful involvement" by the public, is defeated by the record.  After requiring Eversource to provide extensive notice in four languages, the board conducted a public comment hearing on March 30, 2022.  One hundred and nine people participated in the hearing (eighty as attendees and twenty-nine as panelists), which lasted nearly three hours and featured comments by local politicians and residents.  The hearing was simultaneously translated into Spanish, and a video recording was made available online.  In May and June of 2022, the board conducted eight days of public evidentiary hearings at which it heard testimony from twenty-six witnesses, more than half of whom were witnesses for the petitioners.  The board also gave ample time for filing of final briefs.  Given this timeline and the record of participation by the petitioners and the public, the board met its obligation to ensure "meaningful involvement" by all people.[10]  G. L. c. 30, § 62.
            The petitioners also argue that the board overlooked the requirement that it consider "the equitable distribution of energy and environmental benefits and environmental burdens."  G. L. c. 30, § 62, as amended by St. 2021, c. 8, § 56.  The petitioners argue that the board incorrectly deemed energy reliability to be an "energy benefit."  It is true, as the petitioners point out, that the Legislature did not define the phrase "energy benefits,"[11] but the lack of a definition does not preclude a conclusion that the plain, unambiguous meaning of "energy benefits" includes energy reliability.  See Canton v. Commissioner of the Mass. Highway Dep't, 455 Mass. 783, 788 (2010), quoting eVineyard Retail Sales–Mass., Inc. v. Alcoholic Beverages Control Comm'n, 450 Mass. 825, 831 (2008) ("[A] statute is to be construed as written, in keeping with its plain meaning").
            Electricity is vital to nearly every aspect of modern life.  It preserves food, heats and cools homes, enables transportation, healthcare, communication, and work, and supplies artificial light upon which we all depend.  Reliable access to electricity undeniably "produces good or helpful results or effects or . . . promotes well-being," unambiguously qualifying it as an energy benefit.  Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/benefit [https://perma.cc/7KGA-TKE3].  Indeed, as the board identified in its decision, the Legislature has previously recognized the critical need for energy reliability.  See, e.g., St. 1997, c. 164, § 1 (h) ("reliable electric service is of utmost importance to the safety, health, and welfare of the [C]ommonwealth's citizens and economy").  Cf. 220 Code Mass. Regs. §§ 25.00 (2009) (forbidding utilities from shutting off customer's electricity under numerous circumstances).  We see no error in the board's conclusion that energy reliability is an "energy benefit" within the meaning of the environmental justice principles.  
            We likewise reject the petitioners' arguments that the board failed to properly weigh the substation's energy and environmental benefits against its environmental burdens.  On one side of the scale, the board weighed the substation's energy benefit in preventing power outages, as well as the environmental benefits of removing almost 10,000 tons of contaminated soil and treating thousands of gallons of contaminated groundwater at the city-owned site -- remediation the city was unable or unwilling to fund itself.  On the other hand, the board assessed the anticipated environmental burdens of the project and found them to be temporary and capable of mitigation.  The Next-Generation Roadmap Act requires that the agency "consider" these factors, G. L. c. 30, § 62K, and the board's decision amply reflects such consideration.[12]
            d.  Chapter 91 tidelands license.  We turn next to the petitioners' challenges to the board's issuance, as part of the certificate, of the equivalent of a G. L. c. 91 tidelands license.  Chapter 91 governs the use of waterways and tidelands[13] and is administered by the Department of Environmental Protection (DEP).  Construction of a structure in a tideland requires a license from DEP.[14]  G. L. c. 91, § 14.  If a structure is for a "water dependent use," the process is more streamlined and the substantive requirements are less onerous than if for "nonwater dependent uses."  G. L. c. 91, §§ 14, 18.  See Moot v. Department of Envtl. Protection, 448 Mass. 340, 342-344 (2007), S.C., 456 Mass. 309 (2010) (explaining regulatory scheme).  A project found to be water dependent under c. 91 is also exempt from additional regulatory scrutiny that may otherwise be required by policy of the Executive Office of Energy and Environmental Affairs (EEA) or by the Massachusetts Environmental Policy Act (MEPA).  See GreenRoots, Inc., 490 Mass. at 753 (noting that for projects exceeding MEPA thresholds "agencies must provide enhanced public participation and [e]nhanced analysis of impacts and mitigation" [quotation and citation omitted]); 301 Code Mass. Regs. § 11.03 (2023).
            In January 2022, DEP issued a draft tidelands license for construction of the substation.  The license identified the substation as "ancillary to the existing water-dependent industrial infrastructure crossing facility"[15] and, therefore, as a water dependent use under DEP regulations.[16]  See 310 Code Mass. Regs. §§ 9.02, 9.12(2)(d) (2024).  Before a final c. 91 license issued, however, Eversource commenced certificate proceedings before the board, leading DEP to pause its own proceedings. 
            The board incorporated DEP's findings into its decision and determined that Eversource met the requirements for issuance of a c. 91 license.  The petitioners now raise two objections to that approach and conclusion.  First, they contend that the board was required to undertake a de novo review of the project's qualifications for the license, without relying on DEP's findings.  In the alternative, they argue that, even if the board was permitted to consider and rely upon DEP's findings, the board's determination that the substation was a water dependent facility was incorrect. 
            We are not persuaded by either argument.  The first is effectively foreclosed by our decision in Alliance II, 457 Mass. at 678 n.27.  There, as here, DEP had granted a draft c. 91 license prior to the commencement of certificate proceedings, and there, as here, the board "incorporated DEP's findings into its certificate decision and included the equivalent of a tidelands license in the certificate it granted."  Id.  We upheld the board's decision, noting that the board's enabling statute reflected "the Legislature's interest in having DEP, the agency to which the Legislature generally has granted authority to issue such licenses, play a role in the . . . board's decision where a c. 91 tidelands license is in issue."[17]  Id. at 679 n.29.  It is accordingly neither arbitrary nor capricious for the board to consider and incorporate DEP findings rather than conduct an entirely de novo review.  
            Further, the board did not blindly adopt DEP's findings, but rather probed their relevance and reliability.  It took testimony from a DEP witness, who explained in detail the process and reasoning that led to the issuance of the draft license.  The board also reviewed the materials submitted to DEP in support of Eversource's application, as they were part of the record in the certificate proceeding.  As a result, the board was well equipped to assess whether and how to incorporate DEP's findings into its own analysis, and its decision to do so was not arbitrary or capricious.[18]
            Contrary to the petitioners' further arguments, there was substantial support for the board's conclusion that the substation was water dependent and deserving of a tidelands license.  In particular, the petitioners' complaint that the board did not adequately assess alternative sites -- a consideration relevant to whether the substation could "reasonably be located or operated away from tidal or inland waters," 310 Code Mass. Regs. § 9.12(2)(d) -- is belied by the record.  The board had already considered the siting of the substation twice before.[19]  In the proceedings for the initial application, the board scrutinized various alternative sites before concluding that there were no "readily available, superior sites in East Boston."  Subsequently, when considering the request to relocate the substation on the parcel, the board undertook an extensive analysis of environmental impacts, concluding that the current proposed site was the best option to meet the need for the substation "with minimum impact on the environment, at the lowest possible cost." 
            It is true that the two previous analyses were made outside the context of the tidelands license, and thus did not ask the precise question posed by the relevant DEP regulations:  whether the "facility cannot reasonably be located or operated away from tidal or inland waters, based on a comprehensive analysis of alternatives and other information analyzing measures that can be taken to avoid or minimize adverse impacts on the environment."  310 Code Mass. Regs. § 9.12(2)(d).  But the past inquiries were closely related, as they considered the reasonableness of alternative locations and sought to minimize environmental impacts.  And the board explicitly connected its past findings to the question at hand.  As a result, its conclusion that "the [proposed site] is the sole feasible location identified in the record, and therefore cannot be reasonably located away from [water]" is supported by substantial evidence, and its decision to award the equivalent of a tidelands license as part of the certificate was lawful.[20]
            e.  Findings required by G. L. c. 164, § 69O.  The petitioners also challenge aspects of three of the board's conclusions:  that the substation is needed "to meet . . . energy requirements"; compatible "with considerations of environmental protection, public health and public safety"; and in the "public interest."  G. L. c. 164, § 69O.  We conclude that each of the findings was adequately supported by the evidence, and the board did not otherwise abuse its discretion in making the findings.
            The need for the substation to meet the area's energy needs was litigated in the previous proceedings before the board, and "[n]othing in the siting board statute or its regulations requires the siting board to conduct, in a certificate proceeding under G. L. c. [164,] §§ 69K–69P, a de novo review of issues such as need or cost that it has addressed in a § 69J proceeding."  Alliance II, 457 Mass. at 694 n.42.  That notwithstanding, the board received updated energy load forecasts by Eversource running through 2030, and the board heard testimony from an expert witness for the petitioners who provided a competing forecast showing a lesser load.  "The evaluation of various data sources to determine need for energy facilities is squarely within the board's 'expertise and experience,' so we give it 'great deference.'"  GreenRoots, Inc., 490 Mass. at 751, quoting MCI Telecomm. Corp. v. Department of Telecomm. & Energy, 435 Mass. 144, 150-151 (2001).  Here, the board comprehensively explained the bases for its finding that the substation was necessary, discussing the increasing electrical load in the area, the limits of the current infrastructure, the risks of significant outages, and the lack of electricity supply alternatives to the substation.  In doing so it confronted the petitioners' arguments and explained its reasons for crediting Eversource's evidence over the petitioners' expert's alternative analysis.  Among other flaws identified by the board, the alternative analysis relied on regional data that was less granular than the local data provided in the Eversource forecast.  This same defect undermined the alternative load analysis presented by the petitioner GreenRoots in the project change proceedings.  See GreenRoots, Inc., 490 Mass. at 752 ("the board considered the data and determined that they would not invalidate the previous finding that another substation was needed to serve local load, because the new data were regional in scope").  Although the petitioners may disagree with that decision, and how the board viewed the evidence as a whole, there is no doubt that the board's finding of need was supported by substantial evidence, and not arbitrary, capricious, or an abuse of discretion.  See Sudbury, 487 Mass. at 738 ("petitioners' arguments are little more than disagreement with how the board interpreted its statutory mandate or balanced [the required] considerations").
            We likewise see no error in the board's considerations of environmental protection, public health and public safety.  Like need, these issues were explored extensively in the prior proceedings, see, e.g., GreenRoots, Inc., 490 Mass. at 756-758 (finding board's analysis of sea level rise reasonable and supported); nonetheless, the board undertook a fresh look at them, incorporating new evidence.  For example, the board took new testimony from the petitioners' expert witness regarding the substation's vulnerability to climate change-related flooding, and scrutinized two reports projecting sea level rise that had been released since the project change proceeding.  The board explained how the new reports supported its previous stance on flood risk, noted that it will require Eversource to regularly reevaluate its sea level rise projections, and explained why the petitioners' proposal to use a "worst case" storm surge projection (that of a "1,000 year storm") was not reasonable.  The board ultimately concluded that the new evidence did not give cause to change prior findings on the same issue.  Its decision in that regard was not an abuse of discretion, and substantial evidence supported the board's findings.
            The board's analysis of public safety considerations followed a similar path.  The board explained that it was satisfied that the safety impacts of the substation would be minimized given Eversource's record of safety, its constant monitoring of the site, and the existence of both company-wide and forthcoming substation-specific safety plans.  Again, the petitioners argue that the evidence should have been weighed differently.  But it does not follow that the board's conclusion was infirm.  To the contrary, it was supported by substantial evidence, and giving the board the deference it is due, we see no abuse of discretion in its evaluation of the evidence.  See Sudbury, 487 Mass. at 738 ("Our role is not to substitute our judgment or the petitioners' judgment for that of the board . . .").
            Finally, the petitioners argue that the board ignored substantial evidence that the project was not in the public interest, including the results of a nonbinding ballot question[21] and comments by public officials.  But the question before us is not whether other people might view the desirability of the project differently or reach a different conclusion than did the board, weighing the various competing considerations.  Instead, as we have already stated, see part 2.a, supra, although our review is not perfunctory, the scope of our review is expressly limited by G. L. c. 164, § 69P, to assessing the constitutionality of the decision, whether the decision conformed to statutory requirements, whether there was substantial evidence to support the decision, and whether the decision was arbitrary, capricious, or otherwise an abuse of discretion.  See Providence & Worcester R.R. v. Energy Facilities Siting Bd., 453 Mass. 135, 140 (2009).
            No such defect appears here.  The decision reflects the board's considered assessment of whether the substation is in the public interest, including the board's findings as to the immediate need for reliable electricity, the lack of feasible alternative sites, and the minimization of environmental impacts.  The board acknowledged the results of the ballot question, but it explained that such results could not be dispositive as that would be contrary to the purpose of the certificate process, which is designed "to ensure that local boards do not use their power over licenses and permits to thwart the needs of the broader community for a reliable, affordable, and environmentally sound energy supply."  City Council of Agawam v. Energy Facilities Siting Bd., 437 Mass. 821, 828 (2002).  This sound reasoning is plainly not an abuse of discretion, and in sum, we discern no error in the board's G. L. c. 164, § 69O findings.
            f.  Postdecision developments.  As we have already noted, the certificate was allowed subject to certain preconstruction compliance conditions.  One such condition, condition R, required Eversource to submit an updated certified cost estimate for the project prior to commencement of construction.  Twelve days after the board issued its decision, Eversource complied with condition R, and submitted an updated cost estimate of $103 million -- a significant increase from the estimated cost of $66 million that the board had before it at the time it rendered its decision.  Eversource identified several root causes for the increase:  project delay, and substantial increases in labor, labor-related costs, and material and equipment, due in part to global events and supply chain disruptions, and a significant increase in the rate of inflation.  The petitioners argue that the board acted arbitrarily or capriciously when, in light of the substantial increase in the estimated cost, it did not sua sponte revisit its decision to grant the certificate.  But the board's response (or lack of response) to a postdecision submission is not properly before us in this appeal.  See Providence & Worcester R.R., 453 Mass. at 140, quoting G. L. c. 25, § 5 (appeal from board decision is permitted only from "final decision, order or ruling").  Additionally, the petitioners do not appear to have sought relief from the board in the first instance.  In the circumstances, the petitioners have not shown that the board acted arbitrarily or capriciously in not sua sponte revisiting its decision when Eversource complied with condition R and updated the cost estimate.  
            In a similar vein, the petitioners argue that the board should have delayed its decision until after (1) the EEA's MEPA office had promulgated updated MEPA regulations (which ultimately occurred five weeks after the November 2022 decision), and (2) the board had developed its own specific environmental justice strategy (which did not occur until February of 2024).  Given the board's statutory obligation to issue a decision "[a]s expeditiously as possible," G. L. c. 164, § 69O, we cannot say it abused its discretion in declining the petitioners' request that it delay its decision.  Equally important, however, the petitioners have not established what would have been accomplished by delay.  The board was aware of the anticipated MEPA amendments, discussed and analyzed them in its decision, noted that the amendments were consistent with the requirements of the Next-Generation Roadmap Act, and included those amendments in its over-all consideration of the environmental justice provisions.
            3.  Conclusion.  For the reasons set out above, we affirm the decision of the board.
So ordered.
 
footnotes

 
            [1] GreenRoots, Inc.
            [2] NSTAR Electric Company, doing business as Eversource Energy, intervener.
            [3] Boston Residents Group vs. Energy Facilities Siting Board & another.
            [4] We acknowledge the amicus brief submitted by the Union of Concerned Scientists.
            [5] Construction of facilities for generating electricity is governed by separate, parallel sections.  See, e.g., G. L. c. 164, §§ 69J 1/4, 69J 1/2, 69K 1/2.
            [6] Title 980 Code Mass. Regs. § 6.02 refers to the initial filing as an "initial petition," whereas c. 164 refers only to a "petition."  This minor difference in nomenclature between the statute and the regulations appears to carry no substantive meaning and, in any event, does not affect our analysis.
            [7]Eversource began the approval process before the public improvement commission in April 2021, and pursued it diligently thereafter.  Eversource complied with the agency's requests and procedures thereafter, understanding the matter would be placed on the agency's agenda.  Nine months later, in January 2022, with no explanation for the change in its position, the agency informed Eversource that the matter would not be placed on the agency's agenda. 
            As to the parks and recreation department, Eversource filed its application in March 2021.  Seven months later, having taken no other action on the application, the department notified Eversource that it would not place the application on its agenda until after all other approvals were obtained. 
            [8] Conservation Law Foundation and GreenRoots, Inc., both environmental nonprofit organizations, were permitted to intervene as full parties.  Boston Residents Group intervened as a limited party on the "issue of damage to the environment and the elimination or reduction thereof," pursuant to G. L. c. 30A, § 10A.  Although the Boston Residents Group filed a petition and a separate brief in this appeal, the positions of the three petitioners are aligned, and thus for simplicity we refer to all three parties collectively as "petitioners."
            [9] The certificate functions as the equivalent of fourteen different approvals, permits, and licenses.
            [10] The petitioners also claim that the board fell short of ensuring "meaningful involvement" during its public deliberations.  Specifically, they argue that the board acted arbitrarily and capriciously by not ruling on motions raised by one of its newer members requesting further exploration of environmental and siting issues.  The record shows that the board members discussed the contents of the motions (including how the concerns raised in the motions had been addressed in prior proceedings) and explained to the movant that, pursuant to the board's standard procedure, the motions required a second to proceed.  No motion was seconded, and we see neither arbitrariness nor caprice in the board's declining to address the motions further.
            [11] By contrast, "environmental benefits" is defined as "the access to clean natural resources, including air, water resources, open space, constructed playgrounds and other outdoor recreational facilities and venues, clean renewable energy sources, environmental enforcement, training and funding disbursed or administered by the executive office of energy and environmental affairs."  G. L. c. 30, § 62, as amended by St. 2021, c. 8, § 56.
            [12] The petitioners cite no authority for their assertion that the board may not give any weight to energy or environmental benefits that are paid for by Eversource because those benefits are indirectly funded by payments from its customers.  Apart from the lack of legal authority for this proposition, it is at odds with the goals of the Next-Generation Roadmap Act as it would discourage or deter corporate applicants from undertaking environmental or energy benefits.
            [13] It is undisputed that the proposed site of the substation is a "Commonwealth tideland."  General Laws c. 91, § 1, defines "tidelands" as "present and former submerged lands and tidal flats lying below the mean high water mark," and "Commonwealth tidelands" as "tidelands held by the [C]ommonwealth in trust for the benefit of the public or held by another party by license or grant of the [C]ommonwealth subject to an express or implied condition subsequent that it be used for a public purpose." 
            [14] If the tidelands are Commonwealth tidelands, the structure must also "serve a proper public purpose and that said purpose [must] provide a greater public benefit than public detriment to the rights of the public in said lands."  G. L. c. 91, § 14.  Under DEP regulations, however, a water-dependent structure presumptively satisfies these additional criteria.  See 310 Code Mass. Regs. § 9.31(2) (2024).
            [15] The preexisting water dependent facility is an electricity transmission line running under Chelsea Creek, which is adjacent to the parcel that will house the substation.  
            [16] An "infrastructure crossing facility" is "any infrastructure facility which is a bridge, tunnel, pipeline, aqueduct, conduit, cable, or wire, including associated piers, bulkheads, culverts, or other vertical support structures, which is located over or under the water and which connects existing or new infrastructure facilities located on the opposite banks of the waterway."  310 Code Mass. Regs. § 9.02 (2024).  The regulations go on to specify that "[a]ny structure which is operationally related to such crossing facility and requires an adjacent location shall be considered an ancillary facility thereto," and list "power transmission substations" as an example of an ancillary facility.  Id.
            DEP "shall" find such an ancillary facility to an infrastructure crossing facility "to be water-dependent" upon a finding "that such facility cannot reasonably be located or operated away from tidal or inland waters, based on a comprehensive analysis of alternatives and other information analyzing measures that can be taken to avoid or minimize adverse impacts on the environment."  310 Code Mass. Regs. § 9.12(2)(d) (2024).
            [17] In both cases, DEP was a party to the certificate proceedings and assented to the use of its draft license as a component of the certificate.  See Alliance II, 457 Mass. at 678 n.27.
            [18] The petitioners argue that the board erred in concluding that the substation "requires an adjacent location" to the preexisting water dependent transmission line, see 310 Code Mass. Regs. § 9.02, because the term "requires" means "necessitates."  According to the petitioners, the existence of alternate potential sites showed that it was not necessary for the substation to be located where Eversource proposed.  But, even accepting the petitioners' view of the meaning of the word "requires," here the board could permissibly find that the alternate sites to which the petitioners pointed were not feasible.  Accordingly, they did not preclude the board from finding that the substation is required to be adjacent to the transmission line in its currently proposed location.
            [19] In addition, as the board noted, an alternative site analysis had been performed in the DEP proceedings.
            [20] As we find no error in the board's designation of the project as water dependent, we need not address the parties' arguments regarding the board's alternative analysis, which concluded that the substation would be entitled to a tidelands license even if it were not water dependent.  See Alliance II, 457 Mass. at 678-679 & n.28.  We likewise need not reach the petitioners' argument that the project should have been subject to additional participation and analysis requirements under MEPA and an applicable agency policy, which is contingent upon the substation being non water dependent.  See GreenRoots, Inc., 490 Mass. at 754 n.6; 301 Code Mass. Regs. § 11.03.  Finally, we see no merit in the petitioners' unsupported claim that the board abused its discretion by failing to require additional participation and analysis, notwithstanding that such was not required by MEPA, EEA policy, or any other law or regulation.  See G. L. c. 164, § 69P.
            [21] The city-wide ballot question was posed to all voters in November of 2021, and was framed as follows:  "Should a high voltage, electrical substation be built at 400 Condor Street in East Boston, along Chelsea Creek, near homes, parks, playgrounds, jet fuel storage, and in a flood risk area rather than in a nearby alternative safe and secure location such as non-residential Massport land at Logan Airport?"  See City of Boston Municipal Election Ballot Questions, Question 2 (Oct. 21, 2021), https://www.boston.gov/news/city-boston-municipal-election-ballot-questions [https://perma.cc/7RN4-9CQ4].  The results were 16.25 percent voting "yes," and 83.75 percent voting "no."  We note that the record shows that the Massachusetts Port Authority was unwilling to sell any of its land to Eversource for the construction of the substation, and therefore, the choice presented in the ballot question lay in the realm of the hypothetical because the substation could only be built on land owned by Eversource.